JOHN HARRISON CAMPBELL,        )
                               )
        Plaintiff,             )
                               )
    vs.                        ) Civil Action No. 09-218
                               )
COMMISSIONER OF SOCIAL         )
SECURITY,                      )
                               )
        Defendant.             )

**MEMORANDUM OPINION**

## I. **INTRODUCTION**

Plaintiff, John Harrison Campbell, seeks judicial review of
a decision of Defendant, Commissioner of Social Security ("the
Commissioner"), denying his applications for disability insurance
benefits ("DIB") and supplemental security income ("SSI") under
Titles II and XVI, respectively, of the Social Security Act, 42
U.S.C. §§ 401-433 and §§ 1381-1383f. Presently before the Court
are the parties' cross-motions for summary judgment pursuant to
Fed.R.Civ.P. 56. For the reasons set forth below, Plaintiff's
motion for summary judgment will be denied, and the
Commissioner's cross-motion for summary judgment will be granted.

## II. **PROCEDURAL HISTORY**

Plaintiff filed applications for DIB and SSI on July 27,
2006, alleging disability since February 3, 2006 due to diabetes,

1

residuals of surgeries for a right clubfoot,[1] a respiratory problem and a learning disability. (R. 118-23, 124-29, 176). Plaintiff's applications for DIB and SSI were denied, and he requested a hearing before an Administrative Law Judge ("ALJ"). (R. 106). At the hearing, which was held on July 10, 2008, Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified.[2] (R. 25-61).

On September 18, 2008, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI based on his conclusion that Plaintiff retained the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.[3] (R. 9-24). Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on December 24, 2008. (R. 1-3, 4-5). Thus, the ALJ's adverse decision became the final decision of the Commissioner. This appeal followed.

---

[1]Clubfoot is a birth defect of the foot and ankle. The type of surgery that is done depends on the severity of the deformity, the age of the child and the other treatments the child has received. Plaintiff also had hammer toes on his right foot which required surgery. Hammer toe is a deformity of the toe in which the end of the toe is bent downward. www.nlm.nih.gov/ medlineplus/encyclopedia (last visited 7/6/2009).

[2]At the conclusion of the hearing, the ALJ indicated that his decision would be deferred pending a psychological evaluation of Plaintiff in light of his learning disability. (R. 60).

[3]The Social Security Regulations define RFC as the most a disability claimant can still do despite his or her physical or mental limitations. See 20 C.F.R. § 404.1545(a).

2

## III. BACKGROUND

Plaintiff was born on February 4, 1970. (R. 118). Due to a learning disability, Plaintiff was placed in special education classes for certain subjects while in school. After he graduated from high school in June 1989, Plaintiff completed training as dental lab technician.[4] (R. 53, 181-82, 186, 188). Plaintiff has not worked since February 2006, when his job as a forklift operator ended.[5] At the hearing, Plaintiff testified that he could not continue to perform this job because of lung problems. The shop was "extremely dusty" and a dust mask did not help.[6] (R. 39, 46, 158).

Plaintiff claims that he is no longer able to work as a result of his medical conditions because he cannot stand for

---

[4]On October 31, 2006, Plaintiff informed a consultative examiner that he had been employed as a dental lab technician for four months, but had to quit that job "because of long hours and the fact that he had to stand for prolonged periods of time." (R. 350).

[5]Plaintiff also has held jobs as a laborer for a placement service, a hospital and a pet store, a car attendant for an automobile dealership, an ice bagger and deliverer, a sign painter, a clerk and stockperson for a convenience store, an industrial painter for a railroad car construction company and a desk clerk for a rental car company. (R. 51-52, 177).

[6]In an undated Disability Report, Plaintiff indicated that his job as a forklift operator was terminated by the employer because he missed 8 days of work as a result of taking medication for a respiratory condition that precluded him from operating a forklift. He also indicated that his primary care physician told him to find a different job due to the environment in which he was required to work and his lung problems. (R. 176, 183).

3

prolonged periods of time, he cannot carry heavy objects, he has difficulty following directions (although he can read and write), and he has breathing problems. (R. 176, 183).

## IV. MEDICAL AND PSYCHOLOGICAL EVIDENCE

The evidence before the ALJ for the relevant time period may be summarized as follows:

On November 14, 2005, Plaintiff was seen by his primary care physician ("PCP"), Dr. Kary Schroyer, for an ear problem, coughing and allergies, reporting that he "works in dust." During a follow-up visit on November 16, 2005, Plaintiff reported that he was not feeling any better. He still could not hear out of his right ear, he continued to cough all night, and he had chest pain. (R. 292). In light of Plaintiff's cough, a chest x-ray was taken. The result was described as follows:

\* \* \*

Patient is mildly hypoventilated. Lung fields are normal for degree of inspiratory effort. Heart size is normal. There are no hilar or pleural abnormalities.

Impression: Mild hypoventilation.[7]

(R. 291).

On September 8, 2006, Plaintiff was seen by Dr. Schroyer for

---

[7]Hypoventilation is too shallow or too slow breathing which does not meet the needs of the body. It may also refer to reduced lung function. If a person hypoventilates, the body's carbon dioxide level rises, which results in too little oxygen in the blood. www.nlm.nih.gov/medlineplus/encyclopedia (last visited 7/13/2009).

4

a "good physical" because he had recently obtained health insurance and wanted to go back on his medications. Dr. Schroyer's diagnoses included type 2 diabetes, anxiety, high cholesterol and foot numbness, and he prescribed several medications for Plaintiff. (R. 368). Due to complaints of chest pain and shortness of breath, x-rays of Plaintiff's chest were taken that day. The x-rays showed "no acute cardiopulmonary disease." (R. 348).

Plaintiff was seen by Dr. Schroyer for a follow-up visit on September 22, 2006. Plaintiff's blood glucose remained high, and the doctor increased the dosage of his diabetes medication.[8] (R. 368). Dr. Schroyer also ordered nerve conduction studies of Plaintiff's upper and lower extremities which were performed on September 26, 2006. The results were described as follows:

**SUMMARY:**

Lower extremity sensory findings:

\*   \*   \*

This study is abnormal. This computer generated summary should be reviewed by a physician in context of the patient history and clinical findings.

In patients with diabetes mellitus, this study is consistent with diabetic polyneuropathy (DPN) characterized by mild nerve conduction abnormalities.

_____

[8]Glucose levels should be between 50 and 80 mg/100mL. www.nlm.nih.gov/medlineplus/encyclopedia (last visited 7/13/2009). On September 22, 2006, Plaintiff reported to Dr. Schroyer that his blood glucose levels had been ranging between 200 and 300 mg/100mL. (R. 368).

5

Upper Extremity Analysis:

This study is consistent with a moderate right median neuropathy, clinical correlation required to localize.

\* \* \*

(R. 418).

Due to Plaintiff's complaint of shortness of breath, a nuclear stress test was ordered to evaluate Plaintiff for ischemia.[9] The test, which involves exercise on a treadmill, was performed on October 5, 2006. The impression was described as follows:

IMPRESSION:
Normal myocardial perfusion ... after excellent exercise. The patient had no chest pain. The stress EKG did not show signs of ischemia. The hemodynamic response was normal. The resting LV function is normal.

COMMENT:
Probability of coronary artery disease; low.
Probability of ischemia; low.

(R. 338-39).

During a follow-up visit with Dr. Schroyer on October 9, 2006 to discuss the results of the nerve conduction studies and stress test, Plaintiff complained of numbness in his toes. (R. 367).

On October 12, 2006, during an appointment with Dr. Robert

---

[9]Cardiac ischemia occurs when blood flow to the heart muscle is decreased by a partial or complete blockage of a coronary artery. A sudden, severe blockage may lead to a heart attack. Cardiac ischemia may also cause a serious abnormal heart rhythm, which can cause fainting or even sudden death. Shortness of breath is a typical symptom of cardiac ischemia. www.mayoclinic.com (last visited 7/9/2009).

6

Baker, the orthopedic surgeon who performed multiple surgeries on Plaintiff's right clubfoot and ankle, Plaintiff complained of limited range of motion in the right foot, swelling after standing for prolonged periods, difficulty walking "any distance," increased pain when driving, trying to mow the lawn and walking on uneven surfaces, and night pain. Dr. Baker noted that Plaintiff has a right leg limp, and that he uses a cane to ambulate at times.[10] (R. 326).

Due to his complaints of shortness of breath, on October 30, 2006, Plaintiff underwent pulmonary function tests ("PFTs"). The findings were consistent with a "mild restrictive pattern."[11] (R. 466).

On October 31, 2006, Dr. R. Liedke performed a consultative examination of Plaintiff at the request of the Pennsylvania Bureau of Disability Determination. With respect to Plaintiff's physical examination, Dr. Liedke noted, among other things, that Plaintiff's lungs were clear to auscultation and he had no wheezes on forced expiration; that Plaintiff could sit

---

[10]Dr. Baker performed the first surgery on Plaintiff's right clubfoot and ankle when he was 6 years old. In 1985, Dr. Baker performed surgery on Plaintiff's hammer toes, and, in 1991, Dr. Baker performed a triple arthrodesis (fusion of bones) on Plaintiff's right clubfoot and ankle. (R. 477).

[11]Restrictive lung disease is a low-air-volume disorder. Not enough air can get into the blood stream due to thickened walls of the air sacs (alveoli). www.pulmonaryfibrosis.org (last visited 7/9/2009).

7

comfortably in a chair; that Plaintiff walked to the examination table and was successful in getting up and down; that Plaintiff did not need a device to assist ambulation despite a significant limp; that Plaintiff's upper body strength was 5/5; that the range of motion in Plaintiff's right hip was restricted to 50% due to pain; that Plaintiff's right leg is 3/4 to 1 inch shorter than his left leg; that the diameter of Plaintiff's right calf is 4 inches less than the diameter of his left calf; that Plaintiff's range of motion in his right ankle was significantly restricted due to fusion of the ankle; and that Plaintiff's right leg was "slightly" weaker than his left leg. With respect to Plaintiff's mental status, Dr. Liedke noted that Plaintiff tended to ramble when he spoke, but his speech patterns were coherent; he had good eye contact; he had a good command of his medical history and was quite pleasant; and he showed no signs of depression. In a Medical Source Statement concerning Plaintiff's ability to perform work-related physical activities, Dr. Liedke opined that Plaintiff's ability to stand and walk in an 8-hour workday was limited to one hour or less; that Plaintiff's ability to sit in an 8-hour workday was unlimited; that Plaintiff should not engage in pushing and pulling activities with his upper and lower extremities; that Plaintiff should never kneel, stoop, crouch, balance or climb; and that Plaintiff should avoid environments with poor ventilation, heights, vibration,

8

temperature extremes, chemicals, dust, fumes, odors, gases and humidity.[12]   (R. 349-57, 477).

During a follow-up visit with his orthopedic surgeon on November 21, 2006, Plaintiff complained of pelvic pain of several months' duration and tingling in his feet. Dr. Baker prescribed exercises for Plaintiff, noting that if the exercises did not provide relief from the pain, an injection would be administered. (R. 475).

On December 14, 2006, during another follow-up visit with Dr. Baker, Plaintiff complained of low back pain radiating into his buttocks and down his legs. Due to these complaints, Dr. Baker ordered an MRI of Plaintiff's lumbar spine. (R. 475). The impression of Plaintiff's MRI, which was performed on December 18, 2006, was described as follows: "Curvature of the lumbar spine convex to the right. L5-S1 minimal posterior annular disc bulging, left preforaminal disc herniation impinging the left S1 nerve root." (R. 473).

On December 21, 2006, a State agency medical consultant completed a Physical RFC Assessment based on a review of Plaintiff's administrative file. The non-examining consultant

---

[12]Regarding Plaintiff's ability to work in light of his right leg problems, Dr. Liedke noted that Plaintiff would have difficulty standing for prolonged periods of time and difficulty walking any distance. Dr. Liedke also noted that Plaintiff had been most successful in seated jobs, and he recommended a light industrial fabrication type job in which Plaintiff would have the opportunity to sit. (R. 353).

opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; that Plaintiff could stand and/or walk at least 2 hours in an 8-hour workday; that Plaintiff could sit about 6 hours in an 8-hour workday; that Plaintiff's ability to push and pull with his upper and lower extremities was unlimited; that Plaintiff could occasionally climb, balance, stoop, kneel, crouch and crawl; and that Plaintiff had no environmental limitations.[13]  (R. 369-73).

During Plaintiff's next follow-up visit with the orthopedic surgeon on January 4, 2007, Dr. Baker noted that Plaintiff was "markedly improved" and he advised Plaintiff to continue his exercises.  (R. 471).

On January 5, 2007, Plaintiff was referred by his PCP to Dr. Gyorgy Mundruczo, a pulmonologist, due to the abnormal PFTs in October 2006.  Dr. Mundruczo's physical examination of Plaintiff was positive for shortness of breath and nonproductive cough, joint pain, a limp due to the long term consequences of his right clubfoot and numbness and tingling in his feet.  As a result of Plaintiff's previous occupational exposure to harmful dusts and

---

[13]In support of his assessment, the consultant noted that Plaintiff's diabetes was "fairly" controlled with oral medication and had not resulted in significant complications or end organ damage; that Plaintiff's right leg condition was stable; and that although Plaintiff complained of shortness of breath due to silica exposure, his PFTs were unremarkable, he was not taking any medication for his lung condition and his lungs were clear upon examination.  (R. 374-75).

10

possibly asbestos, Dr. Mundruczo ordered a high resolution CT
scan of his lungs and instructed Plaintiff to continue using the
Advair inhaler which had been prescribed by his PCP.[14]  (R. 463-
65).

During a follow-up visit on February 7, 2007, Dr. Mundruczo
noted that the CT scan of Plaintiff's lungs ruled out pulmonary
fibrosis.  Dr. Mundruczo also noted that although Plaintiff
continued to complain of some shortness of breath, he was
breathing comfortably and looked well; his breath sounds were
clear bilaterally; and he had no wheezing.  Dr. Mundruczo
described Plaintiff's pulmonary symptoms as mild, and he ordered
additional tests for Plaintiff.[15]  (R. 462).

Plaintiff was referred by his PCP to Dr. Eugena Wright, an
endocrinologist, for "evaluation and management of uncontrolled
type II diabetes."  Following a physical examination of Plaintiff
on February 26, 2007, Dr. Wright noted that his extremities were
"very cool to touch, specifically his feet;" that his pedal

_____

[14]Advair is a combination of drugs used to prevent wheezing,
shortness of breath and breathing difficulties caused by asthma
and chronic obstructive pulmonary disease.  One of the drugs is
in a class of medications called steroids, and it works by
reducing swelling in the airways.  The other drug works by
relaxing and opening air passages in the lungs, making it easier
to breathe.  www.nlm.nih.gov/medlineplus/druginfo (last visited
7/9/2009).

[15]In his assessment of Plaintiff's lung condition, Dr.
Mundruczo noted he did not feel that Plaintiff had developed lung
disease from silica exposure and doubted that Plaintiff had any
significant scarring in his lungs from a previous burn injury to
his neck and face.  (R. 462).

11

pulses were "barely palpable;" and that he had "trace ankle edema
on the right foot." Plaintiff was instructed to monitor and
record his blood glucose before meals and at bedtime for the next
two weeks and send the results to Dr. Wright, and he was
prescribed oral medication for his diabetes. (R. 493-95).

During a follow-up visit with Dr. Mundruczo, the
pulmonologist, on March 2, 2007, Plaintiff's breath sounds were
"coarse" bilaterally. Dr. Mundruczo noted that Plaintiff had
undergone a methacholine challenge test and negative inspiratory
force and positive expiratory force maneuvers the previous day,
and that the results were negative.[16] As a result, Dr. Mundruczo
ruled out asthma, opining that Plaintiff's respiratory impairment
may be "a long term result of oxygen toxicity suffered as an

---

[16]These tests are lung function tests which may be needed to
confirm an asthma diagnosis. Spirometry is a non-invasive test
which measures how well you breathe. During spirometry, you take
deep breaths and forcefully exhale into a hose connected to a
machine called a spirometer. Spirometry testing reveals two
measurements that are important in diagnosing asthma: (1) forced
vital capacity which is the maximum amount of air you can inhale
and exhale and (2) forced expiratory volume which is the maximum
amount of air you can exhale in one second. Your doctor compares
these two measurements and, if certain key measurements are below
normal for a person of your age, it may be a sign that your
airways are obstructed. If your measurements improve after
inhaling a bronchodilator drug used in asthma treatment to open
obstructed air passages, it is likely that you have asthma.
During a challenge test, your doctor deliberately tries to
trigger airway obstruction and asthma symptoms by having you
inhale an airway-constricting substance such as methacholine.
After triggering your symptoms, you retake the spirometry test.
If your spirometry measurements are still normal, it is likely
that you do not have asthma. But if your measurements have
fallen significantly, it may mean that you have asthma.
www.mayoclinic.com (last visited 7/9/2009).

infant," and that he could have some type of mild occupational lung disease on top of the presumed effects of oxygen toxicity.[17] Plaintiff was advised to continue using the Advair inhaler, and Dr. Mundruczo added Albuterol to Plaintiff's medication regime.[18] Plaintiff was instructed to schedule a follow-up visit in 6 to 12 months. (R. 458).

On April 17, 2007, Plaintiff was seen his orthopedic surgeon to follow-up on his low back pain. Due to continued complaints of pain, Dr. Baker administered a paraspinal nerve block to Plaintiff. (R. 471).

Plaintiff was seen by Dr. Wright, the endocrinologist, for a follow-up visit on May 9, 2007. Dr. Wright noted some improvement in the control of Plaintiff's diabetes.[19] She also noted that Plaintiff's activities were limited by severe neuropathy and right foot problems. During this visit, Plaintiff

---

[17]With respect to Dr. Mundruczo's diagnosis of possible oxygen toxicity, Plaintiff informed the doctor that he had been hospitalized on multiple occasions between the ages of 1 and 2 for breathing problems, and that he had been placed in an oxygen tent during these hospitalizations. (R. 462).

[18]Albuterol is used to prevent and treat wheezing, difficulty breathing and chest tightness cause by lung diseases such as asthma and chronic obstructive pulmonary disease. Albuterol is in a class of medications called bronchodilators which work by relaxing and opening air passages to the lungs to make breathing easier. www.nlm.nih.gov/medlineplus/druginfo (last visited 7/9/2009).

[19]In this connection, Dr. Wright also noted that Plaintiff's diet had been poor the previous few weeks: specifically, Plaintiff had been eating Easter candy. (R. 535).

13

expressed interest in an insulin pump to control his diabetes.[20] (R. 535). Subsequently, Plaintiff was scheduled for instruction in the use of an insulin pump. (R. 533).

On June 5, 2007, during a follow-up visit with Dr. Stuart D. Anderson, one of Dr. Baker's associates, Plaintiff continued to complain of low back pain radiating into his legs. Examination of Plaintiff's lumbar spine revealed paraspinal tenderness and restricted range of motion secondary to discomfort. Dr. Stuart's assessment was degenerative disk disease of the lumbar spine. He prescribed medication for Plaintiff and ordered an EMG and nerve conduction studies of Plaintiff's lower extremities. (R. 522).

On June 6, 2007, Plaintiff was seen by Dr. Robert S. Vandrak, a physiatrist, for an initial evaluation. With respect to Plaintiff's physical examination, Dr. Vandrak noted, among other things, that Plaintiff's right leg was approximately 1½ inches shorter than his left leg; that Plaintiff had significant atrophy of his right calf (approximately a 4-inch difference in the diameters of his right and left calves); that Plaintiff's range of motion in his lumbar spine was decreased;[21] that straight

---

[20]Various styles of insulin pumps may be utilized by people with diabetes to inject insulin into the body in a controlled, more convenient manner. An insulin pump can be worn discretely under clothing as it administers insulin to the diabetic. www.nlm.nih.gov/medlineplus/encyclopedia (last visited 7/6/2009).

[21]With respect to Plaintiff's low back pain, Dr. Vandrak noted that Plaintiff had received trigger point injections in his low back, but that Plaintiff was "hesitant to go this route because it increased his blood sugars." (R. 516).

14

leg raising caused some increase in Plaintiff's low back pain;

that Plaintiff frequently changed positions while on the

examination table; that plaintiff's lumbar support muscles were

atrophied; and that, overall, Plaintiff's "gait and station are

wide-based and antalgic." Dr. Vandrak concluded his report of

Plaintiff's evaluation as follows:

**REHAB RECOMMENDATIONS:**

1. He is not able to work at this time. Residual lumbar
radiculopathy combined with other gross lower extremity
structural problems including significant atrophy, fusion of
the right ankle, as well as decreased sensation distally in
both lower extremities combine to make it quite difficult
for work activities involving lifting and carrying of any
sort as well as those requiring standing, walking, or
bending/stooping. Patient's pain level is disabling. He
would not be able to maintain posture for long periods of
time and wound (sic) need frequent breaks. If he did return
to work, it would be short lived and he would not be able to
sustain gainful employment on a regular basis.

(R. 516-17).

The EMG and nerve conduction studies of Plaintiff's lower

extremities that had been ordered by Dr. Anderson were performed

on June 8, 2007. The impression was described as follows:

"The Nerve Conduction studies reveal a moderate to
significant bilateral axonal and demyleinating peripheral
polyneuropathy in the lower extremities. This is consistent
with Diabetes Mellitus or other unknown etiologies. The EMG
study reveals acute and chronic denervation pathology in the
right L4-L5 and L5-S1 distributions."[22]

---

[22]Plaintiff was seen by Dr. Anderson for a follow-up visit on
June 19, 2007. Based on the results of Plaintiff's EMG and nerve
conduction studies, Dr. Anderson described his assessment of
Plaintiff's conditions as "Lumbar degenerative disc disease and
spondylosis as well as diabetic neuropathy." (R. 521).

15

(R. 520).

In the record of a follow-up visit on July 9, 2007, Dr. Wright noted that Plaintiff's diabetes continued to be uncontrolled. Dr. Wright also noted that the "pump educator" and dietician had expressed concerns regarding Plaintiff's readiness to use an insulin pump. Plaintiff was advised that he would not be scheduled for insertion of an insulin pump until he was able to show comprehension and mastery of the necessary skills.[23] (R. 533).

On September 4, 2007, Plaintiff was seen by Dr. Vandrak, the physiatrist, for a follow-up visit. Based on his examination of Plaintiff, Dr. Vandrak opined that Plaintiff continued to be unable to work. Dr. Vandrak noted that Plaintiff has functional mobility problems and limitations with regard to his activities of daily living and generalized activities because of weakness in both the upper and lower extremities, as well as a history of depression and a learning disability.[24] Dr. Vandrak also noted

---

[23]With respect to the concerns about Plaintiff's comprehension and mastery of the skills required to use an insulin pump, Dr. Wright noted that Plaintiff had been diagnosed with a learning disability while in school. (R. 533).

[24]With respect to Plaintiff's history of depression, his administrative file contains records of psychological counseling for the period March 22, 2002 to May 14, 2003. At the time, Plaintiff was going through a divorce and he was having a difficult time. (R. 209-29). The administrative file also shows that anti-depressant medication was prescribed for Plaintiff in 2007 and 2008. (The medication was prescribed, in part, to treat the dysthetic pain in Plaintiff's lower extremities). (R. 517, 524, 545). However, the evidence does not support a finding that

16

that Plaintiff was scheduled for the insertion of an insulin pump the next day. (R. 524).

Plaintiff's next follow-up visit with Dr. Wright occurred on September 18, 2007. The doctor noted that Plaintiff had been using an insulin pump for 2 weeks, and that Plaintiff's blood glucose readings were high in the morning when he ate a lot the previous night.[25] Despite the high readings, no changes were made in the settings of Plaintiff's insulin pump. Plaintiff was advised to monitor his blood glucose for 2 weeks and send the log to Dr. Wright for review. (R. 531).

In the record of his next follow-up visit with Dr. Wright on December 6, 2007, the doctor noted that Plaintiff's diabetes continued to be uncontrolled. Dr. Wright also noted that Plaintiff had not provided her with a blood glucose log that day and that Plaintiff was not very focused and an "evasive historian." Dr. Wright advised Plaintiff that he was responsible for reporting sufficient information to enable her to adjust his diabetes treatment, and that she "will not be chasing down this info." (R. 528).

_____

symptoms of depression significantly impair Plaintiff's ability to work. In fact, Plaintiff did not include depression as a disabling impairment in his applications for DIB and SSI, and he informed a representative of the Social Security Administration on August 7, 2006 that he was not alleging mental health problems. (R. 380).

[25]Dr. Wright indicated that Plaintiff's carbohydrate estimations may be the biggest issue with respect to his high blood glucose readings. (R. 531).

17

During a follow-up visit with Dr. Wright on April 14, 2008, Plaintiff's diabetes continued to be uncontrolled. Dr. Wright noted that Plaintiff was "very noncompliant with diet" and that his weakness is candy. However, because Plaintiff had several normal and near normal blood glucose readings during the previous two weeks, Dr. Wright made no changes in the settings of his insulin pump. (R. 526).

The notes of a follow-up visit with Dr. Vandrak on May 19, 2008, show no change in Plaintiff's medical problems. The doctor indicated that Plaintiff continued to be off work; that Plaintiff had difficulty with functional mobility, activities of daily living and generalized activities because of impairments in both the upper and lower extremities; and that Plaintiff has a history of depression, a learning disability and pulmonary disease. Plaintiff was instructed to schedule a follow-up visit in 4 to 6 months. (R. 545).

The psychological evaluation of Plaintiff that was ordered by the ALJ following the hearing was performed by Kirk Lunnen, Ph.D. on August 19, 2008. During the evaluation, Plaintiff reported having friends and being active socially. Plaintiff's affect and mood were generally within normal limits and his thought process was logical, linear and goal directed. Dr. Lunnen estimated Plaintiff's ability to concentrate to be in the low-average range, and he rated Plaintiff's score on the Global

Assessment of Functioning ("GAF") scale to be a 49.[26]  Plaintiff's
performance on intellectual testing suggested moderate cognitive
impairment in multiple areas and was consistent with borderline
intellectual functioning.  Dr. Lunnen described Plaintiff's
prognosis as "somewhat guarded based on his physical limitations
and his borderline intellectual functioning."  With respect to
activities of daily living, Dr. Lunnen noted that Plaintiff is
able to engage in basic activities, such as shopping, cleaning
and cooking, with some limitations due to his leg problems, and
that Plaintiff is able to maintain appropriate grooming and
hygiene.  As to social functioning, Dr. Lunnen noted that
Plaintiff reported no problems in this area.  Finally, regarding
concentration, persistence and pace, Dr. Lunnen noted that he
observed mild problems with concentration, and Plaintiff reported
physical limitations in persistence and pace due to his leg
problems.  (R. 546-50).

    In conjunction with the psychological evaluation, Dr. Lunnen

_____

[26]The GAF scale is used by clinicians to report an
individual's overall level of functioning.  The GAF scale
considers psychological, social, and occupational functioning on
a hypothetical continuum of mental health - illness.  The highest
possible score is 100, and the lowest is 1.  GAF scores between
41 and 50 denote the following: **"Serious symptoms** (e.g., suicidal
ideation, severe obsessional rituals, frequent shoplifting) **OR
any serious impairment in social, occupational, or school
functioning** (e.g., no friends, unable to keep a job).  American
Psychiatric Association: Diagnostic and Statistical Manual of
Mental Disorders, Fourth Edition, Text Revision. Washington, DC,
American Psychiatric Association, 2000, at 32-34 (bold face in
original).

completed a Medical Source Statement regarding Plaintiff's ability to do work-related mental activities. Dr. Lunnen opined that Plaintiff had slight limitations in his ability to understand, remember and carry out short, simple instructions; that Plaintiff had marked limitations in his ability to understand, remember and carry out detailed instructions; that Plaintiff had moderate limitations in making judgments on simple work-related decisions; and that Plaintiff's borderline intellectual functioning did not affect Plaintiff's ability to respond appropriately to supervision, co-workers and work pressures in a work setting.[27]  (R. 551-53).

## V. ALJ'S DECISION

In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. See 42 U.S.C. § 423(d)(1).  A claimant is considered unable to engage in any

---

[27]The Medical Source Statement defines the degrees of limitation as follows: A "slight" limitation means that "[t]here is some mild limitation in the area, but the individual can generally function well."  A "moderate" limitation means that "[t]here is moderate limitation in this area, but the individual is still able to function satisfactorily."  A "marked" limitation means "[t]here is serious limitation in this area.  The ability to function is severely limited but not precluded."  (R. 551).

20

substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. See 42 U.S.C. § 423(d)(2)(A).

When presented with a claim for disability benefits, an ALJ must follow a sequential evaluation process. See 20 C.F.R. § 404.1520(a)(4). The process was described by the United States Supreme Court in Sullivan v. Zebley, 493 U.S. 521 (1990), as follows:

\* \* \*

Pursuant to his statutory authority to implement the SSI Program, (footnote omitted) the Secretary has promulgated regulations creating a five-step test to determine whether an *adult* claimant is disabled. See Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). (footnote omitted). The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. See 20 C.F.R. §§ 416.920(a) through (c)(1989). In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A)(1989). If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. § 416.920(d). If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits. §§ 416.920(e) and (f).

21

\* \* \*

493 U.S. at 525-26.[28]

With respect to the ALJ's application of the five-step
sequential evaluation process in the present case, steps one and
two were resolved in Plaintiff's favor: that is, the ALJ found
that Plaintiff had not engaged in substantial gainful activity
since his alleged onset date of disability, and the medical
evidence established that Plaintiff suffers from the following
severe impairments: degenerative disc disease, degenerative joint
disease, chronic obstructive airway disease, insulin dependent
diabetes mellitus, depression and borderline intellectual
functioning. (R. 11).

Turning to step three, the ALJ found that Plaintiff's
impairments were not sufficiently severe to meet or equal the
requirements of any impairment listed in 20 C.F.R., Pt. 404,
Subpt. P, App. 1, and, in particular, Listings 1.02, 1.03 and
1.04 relating to musculoskeletal impairments, Listing 3.02
relating to chronic pulmonary insufficiency, Listing 9.08
relating to diabetes mellitus and Listings 12.04 and 12.05
relating to affective disorders and mental retardation,

---

[28]The claimant bears the burden of establishing steps one
through four of the sequential evaluation process. At step five,
the burden shifts to the Commissioner to consider "vocational
factors" (the claimant's age, education and past work experience)
and determine whether the claimant is capable of performing other
jobs existing in significant numbers in the national economy in
light of his or her RFC. Ramirez v. Barnhart, 372 F.3d 546, 550-
51 (3d Cir.2004).

respectively. (R. 12-16).

Before proceeding to step four, the ALJ assessed Plaintiff's RFC, concluding that Plaintiff retained the RFC to perform work at the light exertion level with the following limitations:[29] (1) he cannot climb ladders, ropes and scaffolds; (2) he cannot operate foot controls; (3) he cannot perform work above the shoulder level; (4) he cannot engage in occupational driving; (5) he cannot perform repetitive reaching with his right upper extremity; (6) he cannot be exposed to workplace hazards, vibration under his feet, fumes or dust; (7) he cannot perform tasks involving more than one or two steps; (8) he cannot perform work that involves more than minimal and superficial interaction with supervisors, co-workers and the public; and (9) he cannot perform tasks that involve arbitration, negotiation, confrontation and supervision. (R. 16). The ALJ then proceeded to step four, finding that Plaintiff is unable to perform any of his past relevant work in light of his RFC. (R. 21-22).

Finally, at step five, based on the testimony of the VE, the ALJ found that considering Plaintiff's age, education, past work experience and RFC, there were a significant number of jobs at the light exertion level which Plaintiff could perform, including the jobs of an unarmed guard (160,000 jobs nationally, 1,500 jobs

---

[29]Under the Social Security Regulations, light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." See 20 C.F.R. § 1567(b).

23

regionally), a document preparer (300,000 jobs nationally, 2,400 jobs regionally) and a bench assembler (350,000 jobs nationally, 3,000 jobs regionally). (R. 22-23).

## VI. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

## VII. ANALYSIS

### A

Plaintiff asserts that the ALJ's decision should be reversed and disability benefits awarded to him because the ALJ failed to consider the combined effect of the limitations resulting from his severe impairments. For the reasons which follow, the Court disagrees.

24

**Respiratory Impairment**

Plaintiff asserts that his breathing problem imposes significant restrictions on potential job options because he cannot be near dust, chemicals and pollen and his physical exertion capacity is limited. (Doc. No. 7, p. 5). A review of the ALJ's decision, however, shows that Plaintiff's respiratory impairment was taken into consideration in the assessment of his RFC, *i.e.*, the ALJ limited Plaintiff to work at the light exertion level in an environment that is free of dust and fumes. (R. 16). Moreover, the ALJ's failure to impose further limits on Plaintiff's RFC due to his respiratory impairment is supported by substantial evidence. Specifically, the ALJ noted that the findings of PFTs in October 2006 were consistent with a mild respiratory impairment; that a CT scan ordered by Dr. Mundruczo in February 2007 ruled out pulmonary fibrosis; and that additional testing ordered by Dr. Mundruczo in March 2007 ruled out asthma.[30]  (R. 17-18).

---

[30]With respect to Plaintiff's respiratory impairment, the Court also notes that Plaintiff's performance on a treadmill stress test in October 2006 was described as "excellent" (R. 338-39); that Dr. Liedke, the physician who performed the consultative examination of Plaintiff on October 31, 2006, noted in his report that Plaintiff's lungs "were grossly clear to auscultation and percussion and he had no wheezes on forced expiration" (R. 351); and that during a follow-up visit with Dr. Mundruczo on February 7, 2007, Plaintiff was breathing comfortably and looked well, his breath sounds were clear bilaterally and he had no wheezing. (R. 462).

25

## Orthopedic Impairments

Plaintiff argues that the record "repeatedly and unambiguously confirms [his] assertion of problems with his leg" and "clearly shows" that he has degenerative disc disease, both of which limit his ability to sit, stand and walk.[31] (Doc. No. 7, pp. 5-6). A review of the ALJ's decision shows that Plaintiff's severe orthopedic problems were taken into consideration by the ALJ. Specifically, relying on substantial evidence, *i.e.*, the Medical Source Statement completed by Dr. Liedke after his consultative examination of Plaintiff, the ALJ limited Plaintiff's RFC to work at the light exertion level which does not involve climbing ladders, ropes and scaffolds, operating foot controls, occupational driving, hazards or vibration under his feet. (R. 18).

## Diabetes

Plaintiff challenges the ALJ's finding that the evidence showed his diabetes was "under reasonable control." (R. 12-13). After consideration, the Court is compelled to conclude that this finding also is supported by substantial evidence. Specifically,

---

[31]As noted by the Commissioner in response to Plaintiff's emphasis on the evidence relating to his right leg and back, there is no dispute that he suffers from severe orthopedic problems which impose limitations on his ability to work. The issue, however, is not whether Plaintiff has limitations as a result of his impairments. The issue is whether the limitations preclude the performance of work existing in significant numbers in the national economy. (Doc. No. 9, p. 10).

in the report of Plaintiff's consultative examination on October

31, 2006, Dr. Liedke noted that Plaintiff's diabetes for the

previous 12 years had been controlled with oral medication and

that his control "has been reasonably good." (R. 350). In the

notes of a follow-up visit on May 9, 2007, Dr. Wright noted

improvement in the control of Plaintiff's diabetes. (R. 535).

During a follow-up visit with Dr. Wright on September 18, 2007,

two weeks after the insertion of an insulin pump, the doctor

noted that despite high blood glucose readings on mornings after

Plaintiff had eaten a lot the previous night, no changes would be

made in the settings of his insulin pump. (R. 531). Finally,

during a follow-up visit with Dr. Wright on April 14, 2008, no

changes were made in the settings of Plaintiff's insulin pump

based on several normal or near normal blood glucose readings

during the previous two weeks. (R. 526).

With respect to diabetes, Plaintiff also asserts that Dr.

Wright noted on two occasions that he cannot vary his daily

routine if his diabetes treatment is to succeed. Based on these

alleged notations, Plaintiff maintains that the kind of work he

could perform while successfully treating his diabetes is

"obviously" restricted. (Doc. No. 7, p. 6). A review of the

evidence on which Plaintiff relies to support this argument shows

that he has misconstrued the evidence.

In two undated, unsigned, virtually identical forms

captioned "Insulin Pump Certificate of Medical Necessity,"
several conditions are listed that support a physician's
representation that insulin pump therapy is medically necessary
for a patient.  One of the conditions, which is checked off on
both forms, states: "Variations in the day-to-day schedule (work,
mealtimes, activity level) prevent the achievement of successful
glycemic control with multiple daily injections."  (R. 490, 503).
It is the success of treating diabetes with daily insulin
injections which may be affected by the day-to-day schedule
(including employment) of certain patients, not the success of
treatment with an insulin pump which injects insulin into the
body in a controlled manner.  In fact, this evidence supports a
finding that Plaintiff's use of an insulin pump enhances, rather
than impedes, his ability to work while successfully controlling
his diabetes.

Plaintiff also disputes the ALJ's finding that he "has not
demonstrated any end organ damage" due to diabetes (R. 12),
noting that Dr. Liedke reported in 2006 that he "may be
developing some renal involvement."  (R. 353).  As noted by the
Commissioner in response to this argument, the mere mention of
possible renal involvement is not a diagnosis, and there is no
evidence in the administrative file concerning treatment for
kidney disease.  (Doc. No. 9, p. 14, n.7).  Accordingly, the
ALJ's statement regarding the absence of end organ damage is

supported by substantial evidence.

Finally, Plaintiff notes that he suffers from diabetic
neuropathy which impairs his ability to walk, drive and lift.
Again, a review of the ALJ's decision shows that Plaintiff's
diabetic neuropathy was taken into consideration in the
assessment of his RFC. Specifically, the ALJ limited Plaintiff
to light exertion work with no climbing, no operation of foot
controls, no occupational driving, no exposure to workplace
hazards and no vibration under his feet.

## Mental Impairments

As to his history of depression, Plaintiff disputes the
ALJ's statement that his treatment for depression was limited to
a "brief period" (R. 14), noting that he was seen by a therapist
on a regular basis from March 2002 to February 2003. While the
ALJ's characterization of the length of this treatment as "brief"
may be disputed, the Court concludes that the characterization is
irrelevant because the treatment was successful and ended three
years before the alleged onset date of disability in this case.
Moreover, as noted in footnote 24, Plaintiff did not include
depression among his disabling impairments in his applications
for DIB and SSI, and he informed a representative of the Social
Security Administration on August 7, 2006 that he was not
alleging mental health problems.

Turning to Plaintiff's learning disability, Plaintiff

29

asserts that the ALJ erred in failing to find that his borderline intellectual functioning markedly interferes with his daily life. As evidence of the alleged marked interference, Plaintiff notes that "the experts who interacted repeatedly with Plaintiff expressed concerns as to whether he could handle complex instructions, whether he could take on new tasks, and, most importantly, whether (sic) could comply with the regime necessary to control his diabetes." (Doc. No. 7, p. 7). After consideration, the Court finds this argument unpersuasive.

First and foremost, the ALJ limited Plaintiff to work involving simple, one or two-step tasks. Thus, an inability to handle tasks involving complex instructions is irrelevant. Second, although Plaintiff apparently had difficulties during instruction in the use an insulin pump, he eventually mastered the necessary skills and began to use an insulin pump in September 2007. Third, Dr. Lunnen, who performed the consultative psychological examination of Plaintiff after the hearing, completed a Medical Source Statement in which he opined that Plaintiff's limitations with regard to his ability to understand, remember and carry out short, simple instructions were only slight. Finally, the evidence does not support a finding that Plaintiff's difficulty in controlling diabetes relates to borderline intellectual functioning. Rather, it appears from Dr. Wright's records that the difficulty is related

to Plaintiff's diet, *i.e.*, "poor diet - easter candy" (R. 535, 5/9/07); "carb goal" - "next step carb counting" (R. 533, 7/9/07); "review for late eating and A.M. corrections" (R. 531, 9/19/07); and "his weakness is candy" - "very noncompliant with diet." (R. 526, 4/14/08).

Based on the foregoing, the Court can find no error in the ALJ's failure to find that Plaintiff's borderline intellectual functioning results in marked limitations on his ability to work.

**B**

As an alternative to reversal, Plaintiff asserts that the case should be remanded for further consideration in light of evidence which was not available at the time of the hearing before the ALJ. Specifically, Plaintiff attached statements from two of his treating physicians concerning his ability to perform work-related activity. The first statement was completed by Dr. Vandrak on April 20, 2009, and the second statement was completed by Dr. Anderson on May 18, 2009. The opinions of both doctors concerning Plaintiff's ability to perform work-related activity would preclude the ALJ's finding that Plaintiff retained the RFC to perform work at the light exertion level as well as the ALJ's finding that Plaintiff could perform the physical requirements of work on a regular and continuing basis.[32]

_____

[32]With respect to exertion level, as noted in footnote 29, light work requires the ability to lift no more than 20 pounds at a time with frequent lifting and carrying of objects weighing up

31

When a disability claimant seeks a remand based on evidence presented to the district court that was not before the ALJ when his or her adverse decision became the final decision of the Commissioner, the remand is governed by Sentence Six of Section 405(g) of the Social Security Act, which provides in relevant part:

> The court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is **new** evidence which is **material** and that there is **good cause** for the failure to incorporate such evidence into the record in a prior proceeding; ... (emphasis added).

Thus, this case may be remanded to the Commissioner for consideration of the statements of Drs. Vandrak and Anderson concerning Plaintiff's ability to perform work-related physical activity only if the statements constitute "new" and "material" evidence *and* Plaintiff establishes "good cause" for failing to present them to the ALJ. See Matthews v. Apfel, 239 F.3d 589, 592-93 (3d Cir.2001).

Assuming, *arguendo*, that the statements of Drs. Vandrak and Anderson constitute "new" and "material" evidence, Plaintiff has failed to establish "good cause" for not incorporating the

---

to 10 pounds. Both Dr. Vandrak and Dr. Anderson opined that Plaintiff's lifting and carrying ability was limited less than 10 pounds occasionally. As to sustained work activity, the ability to work on a regular and continuing basis requires the ability to work 8 hours a day, 5 days a week or an equivalent schedule. Both Dr. Vandrak and Dr. Anderson opined that Plaintiff could perform less than a 4-hour workday due to his physical impairments.

statements in the record before the ALJ.  As noted by the
Commissioner, both Dr. Vandrak and Dr. Anderson were treating
physicians whose records were considered by the ALJ in rendering
his decision, and Plaintiff has offered no reason for failing to
procure and submit the doctors' statements to the ALJ prior to
the issuance of his decision.  (Doc. No. 9, p. 15).  Under the
circumstances, this case may not be remanded for further
consideration under Sentence Six of Section 405(g) of the Social
Security Act.[33]

_William L. Standish_

William L. Standish
United States District Judge

Date: July **15**, 2009

---

[33]The Court agrees with the Commissioner that Plaintiff's
recourse is to file new applications for DIB and SSI for the
period after the ALJ's decision.  (Doc. No. 9, p. 18).